COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Bumgardner and Frank
Argued at Richmond, Virginia


QUINTON LAZARR HUNLEY
                                              OPINION BY
v.    Record No. 0285-98-2       JUDGE RUDOLPH BUMGARDNER, III
                                           SEPTEMBER 7, 1999
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF HENRICO COUNTY
                     James E. Kulp, Judge

         Michael N. Herring (Stephen W. Bricker &
         Associates, on brief), for appellant.

         Daniel J. Munroe, Assistant Attorney General
         (Mark L. Earley, Attorney General, on brief),
         for appellee.


     Quinton Lazarr Hunley appeals his conviction of possession

of cocaine with intent to distribute in violation of Code

§ 18.2-248.  He contends the evidence was insufficient to prove

that he knowingly and intentionally possessed the cocaine.  We

conclude that the evidence was sufficient to establish that

fact.  Accordingly, we affirm his conviction.

     On appeal, we view the evidence in the light most favorable

to the Commonwealth, granting to it all reasonable inferences

fairly deducible therefrom.  See Higginbotham v. Commonwealth,

216 Va. 349, 352, 218 S.E.2d 534, 537 (1975).  This Court does

not substitute its judgment for that of the trier of fact, see

Cable v. Commonwealth, 243 Va. 236, 239, 415 S.E.2d 218, 220

(1992), and the trial court's judgment will not be set aside unless plainly wrong or without evidence to support it.  See Commonwealth v. Jenkins, 255 Va. 516, 520, 499 S.E.2d 263, 265 (1998).

So viewed, the evidence established that state police officers were interdicting narcotics traffic at the Amtrak station in Henrico County.  The officers had received information from New York that two individuals, a male and female, had purchased one-way tickets to Richmond only ten minutes before departing.  The officers looked for abnormal behavior by a couple disembarking the train from New York.  Investigator Irwin saw that the defendant and codefendant, Celestine Yancy, quickly exited the crowded train, walked side-by-side through the crowd faster than the other travelers, and always looked straight ahead.  Their very quick pace, lack of conversation, and straight-ahead focus attracted Irwin's attention.  One officer described Yancy as "determined to get through the building."

Irwin followed the two through the terminal and approached them in the parking lot.  Sergeant McLean accompanied him outside.  The defendant carried a brown and gold tote bag at all times.  Yancy carried a leather satchel and a red, white and blue cloth zippered bag.  As they exited the terminal, Yancy handed the defendant the red, white and blue bag.  Irwin identified himself, announced that he was interdicting narcotics

and firearms traffic into Richmond, and asked if they would cooperate in his efforts. Both said, "yes," but Yancy "became visibly, very visibly afraid or scared at that point. She was trembling. Her speech was . . . very low and somewhat stumbling." Irwin told the two that he was not arresting or detaining them but asked if they would be willing to answer some questions. They indicated they were willing to cooperate.

Irwin first asked if he could see their train ticket receipts. The defendant looked at Yancy, searched his pockets, but did not find their tickets. Yancy made no attempt to search for the tickets. The two produced identification when Irwin asked for it, and Yancy volunteered that they had arrived from New York. When asked if the bags they were carrying belonged to them, the defendant stated, "they're our bags." The two suspects denied carrying drugs or guns. Irwin then asked consent to search the bags. When Yancy indicated that she felt he was interfering with her rights, Irwin reiterated that they were not under arrest. Yancy consented to a search but stated, "I really don't want you going through my bags, but I will show you what's in the bags."

Yancy took the red, white and blue bag back from the defendant, unzipped it, and started moving the contents around. McLean saw two shoeboxes for children's hiking boots, which Yancy indicated were for her children. He also saw a new pair of boots loose in the bag, but both boxes appeared to have

weight in them despite the fact that one pair was not in its box.  McLean told Yancy that he appreciated her showing them the contents, but for officers' safety he preferred to search the bag himself.

The group moved to a less conspicuous location in the parking lot near a truck when the defendant said he was embarrassed by being searched in the middle of the lot.  Yancy zipped up the red, white and blue bag, and the defendant carried both it and the brown and gold bag toward the truck.  As they walked toward it, Yancey remarked, "they even know what kind of truck we drive."

Irwin asked permission to pat-down both suspects for weapons.  While female Agent McCaffey patted down Yancy, Irwin kneeled down in front of the defendant's brown and gold bag.  He looked up at the defendant while kneeling over the bag and asked if he could search.  Yancy said "yes"; the defendant with his "head hung down" said, "go for it.  You're just doing your job." Irwin unzipped the brown and gold bag and under a blanket saw what appeared to be a black garbage bag.  He reached in the tote bag and felt two hard, rectangular objects in the garbage bag. Irwin pulled out the garbage bag, which was knotted, and laid it on top of the tote bag.  He asked the defendant for permission to untie the knot.  The defendant again said, "go for it, you're just doing your job."  Irwin retrieved two six-by-two inch rectangular blocks wrapped in gray duct tape.  Though he could

not see in the packages, Irwin thought the blocks were drugs because the wrapping was consistent with illegal narcotics packaging.

As Irwin held up the two rectangular objects, but without indicating his suspicion that they were drugs, the defendant gave a "very deep sigh" and shook his head. Irwin then announced that he believed the bricks were cocaine. The officers arrested both suspects, handcuffed them, and escorted them to an office in the station for further investigation. A field test indicated that the items were in fact cocaine, and, at that point, Yancy volunteered, "It's mine." One of the shoeboxes in the red, white and blue bag contained a third brick. In total, the drugs weighed 6.6 pounds.

During the search incident to arrest, the officers recovered from the defendant a small amount of currency, a pager, and two train ticket stubs from New York to Richmond. The ticket stubs were in his pocket but were issued in the name of Delores Russell Anne. Neither the defendant nor Yancy possessed identification in that name. A cellular telephone and $2,000 in small bills were found in Yancy's leather satchel. An expert testified that the cell phone and pager were significant in the presence of the drugs because drug dealers often use them in conducting their business. He also stated that 6.6 pounds of drugs is inconsistent with personal use and New York is a source city for contraband entering Richmond.

The defendant's sole contention on appeal is that the evidence failed to establish that he was aware of the presence of the cocaine inside the brown and gold bag or that he was aware of its nature and character. He contends that Yancy's statement of ownership of the drugs and the evidence of the $2,000 cash in her possession rebutted the inference of knowledge, which arose from his possession of the cocaine. We disagree.

To convict the defendant of possession of cocaine, the Commonwealth must show that the "defendant was aware of the presence and character of the particular substance and was intentionally and consciously in possession of it. Physical possession giving the defendant 'immediate and exclusive control' is sufficient. However, possession need not always be exclusive. The defendant may share it with one or more. The duration of the possession is immaterial . . . ." Ritter v. Commonwealth, 210 Va. 732, 741, 173 S.E.2d 799, 805-06 (1970). "Possession of a controlled substance gives rise to an inference of the defendant's knowledge of its character." Josephs v. Commonwealth, 10 Va. App. 87, 101, 390 S.E.2d 491, 498-99 (1990) (en banc) (citation omitted). See Woodson v. Commonwealth, 245 Va. 401, 406, 429 S.E.2d 27, 30 (1993); Gillis v. Commonwealth, 215 Va. 298, 208 S.E.2d 768 (1974). Knowledge may also be proven "by evidence of acts, declarations or conduct of the accused from which the inference may be fairly drawn that he

knew of the existence of the narcotics at the place where they were found." Ritter, 210 Va. at 741, 173 S.E.2d at 805-06 (citation omitted).

Viewing the evidence and all reasonable inferences in the light most favorable to the Commonwealth, we hold that the defendant knowingly and intentionally possessed the cocaine seized from his bag. The defendant acted suspiciously as he and his companion disembarked a train from New York, a known source for drugs. The two walked very quickly from the train through the crowd to the parking lot. The train ticket stubs, which the defendant said he could not find, were later discovered on his person but in a false name.

The defendant stated, "these are our bags." At all times, the defendant was in exclusive possession of, and asserted authority over, the brown and gold tote bag. Officer Irwin asked the defendant for consent to search the brown and gold bag and for permission to untie the knot in the garbage bag. Both times the defendant consented. As the bricks of cocaine were discovered, the defendant, with his head hung down, gave a deep sigh, and shook his head. The facts and circumstances surrounding the defendant's response support as reasonable the inference that showed the defendant knew exactly what the police were discovering.

The defendant claims that an innocent inference could also arise from his response. However, when the trier of fact

accepted an inference favorable to the Commonwealth and the inference was reasonable and justified by the evidence, an appellate court is not at liberty to adopt the opposite inference. An appellate court must "discard the evidence of the accused in conflict with that of the Commonwealth and regard as true all the credible evidence favorable to the Commonwealth and all favorable inferences to be drawn therefrom." Parks v. Commonwealth, 221 Va. 492, 497, 270 S.E.2d 755, 759 (1980) (emphasis in original). "[T]he inferences to be drawn from proved facts are within the province of . . . the court . . . , so long as they are reasonable and justified. . . . That it is possible to surmise or imagine that [the accused] had some other purpose different from that found by the [court] is not enough to overcome [its] . . . reasonable and justified conclusion . . . ." Johnson v. Commonwealth, 209 Va. 291, 295, 163 S.E.2d 570, 574 (1968) (citations omitted).

The defendant asserts that Yancy's claim of ownership was controlling on the issue of knowledge and intent. Yancy made this statement after the officers had formally arrested the two and had field tested the cocaine. Her claim of ownership was not the only evidence of knowledge and intent. Yancy's claim neither refuted the other evidence that the defendant knew drugs were in his bag nor contradicted an inference that the two acted jointly in transporting the drugs. The fact finder was entitled to disbelieve any or all testimony of the witnesses. See

Bridgeman v. Commonwealth, 3 Va. App. 523, 528, 351 S.E.2d 598, 601 (1986) (the credibility of the witnesses and the weight to be accorded their testimony are matters solely for the fact finder who can accept or reject the testimony in whole or in part).

The Commonwealth proved beyond a reasonable doubt that the defendant possessed the bag and knew the drugs were inside it. Accordingly, we affirm the conviction.

Affirmed.

Benton, J., dissenting.

In Burton v. Commonwealth, 215 Va. 711, 213 S.E.2d 757 (1975), the police were alerted by an informer that illegal drugs would be delivered to a jail inmate.  When the accused brought a bag of clothing to the inmate, the officers searched the bag and located the drugs.  In reversing the conviction of the accused for distribution of drugs, the Supreme Court reiterated the following legal standard for proof of possession:

> Although the Commonwealth established that the defendant was in possession of the drugs, it was not established beyond a reasonable doubt that she was knowingly and intentionally in possession.  In Buono v. Commonwealth, 213 Va. 475, 476, 193 S.E.2d 798, 799 (1973), we held:
>
> "To establish 'possession' in a legal sense it is not sufficient to simply show actual or constructive possession of the drug by the defendant.  The Commonwealth must also establish that the defendant intentionally and consciously possessed it with knowledge of its nature and character."
>
>   The evidence does not exclude all reasonable conclusions inconsistent with that of defendant's guilt.  It does not overcome the presumption of innocence to which she is entitled.

Burton, 215 Va. at 713, 213 S.E.2d at 758-59 (citation omitted).  The evidence in this case is equally deficient.

Distilled to its basic elements, the evidence in this case proved Quinton Lazarr Hunley and Celestine Viola Yancy deboarded the train from New York at the Amtrak train station in Henrico County.  The police officers who were at the station were unable

to identify the luggage each was carrying as they deboarded the train because the crowd obstructed the officers' view below the waist.  As Hunley and Yancy walked along the loading platform and through the terminal, each appeared to be carrying luggage. They had three pieces of luggage, which were described as a large leather "purse or satchel-type bag," a "brown and gold tote-type bag" and a red, white and blue cloth or fabric textured bag.  At various times as they walked along the loading platform, Yancy carried both the brown leather purse and the red, white and blue luggage.

Several police officers approached them in the middle of the parking lot.  Hunley then was carrying the brown and gold luggage as well as the red, white and blue luggage.  Although the officers had previously seen Yancy carrying the red, white and blue luggage, she then was carrying only the leather purse. Officer Irwin told them the officers were working to prevent the flow of illegal drugs and firearms into the Richmond area, told them they were not under arrest, and asked if they were willing to answer some questions.  They said, "yes"; however, Yancy became "visibly, very visibly afraid or scared at that point. She was trembling.  Her speech was . . . very low and somewhat stumbling."

Hunley produced a Virginia driver's license, and Yancy produced a college identification card.  Officer Irwin testified that when he asked, "if these [are] ya'll's bags," Hunley

responded, "they're our bags."  Officer Irwin admitted, however, that it was not until the morning of the preliminary hearing in the general district court that he wrote on the back of his sheet of typewritten notes the reference attributing to Hunley the statement, "they're our bags."  The notes he made immediately after the encounter do not contain this reference. No other person attributed that statement to Hunley.

Officer Irwin then requested consent to search the contents of the luggage.  He did not ask either Yancy or Hunley to identify which luggage belonged to whom.  Yancy protested that she did not understand why she and Hunley had been singled out, and said she felt her rights were being violated.  Yancy then said, "Well, I really don't want you going through my bags, but I will show you what's in the bags."  Hunley made no statements concerning the search of the luggage.  Yancy then opened the red, white and blue luggage that she and Hunley both had carried and began to move around the contents.  Officer McLean testified that he observed children's shoeboxes and shoes.

Officer McLean told Yancy he would prefer to search the bag himself and indicated a concern for the officers' safety.  In response to Hunley's comment that he felt embarrassed being detained in the middle of the parking lot, Officer Irwin said, "would you mind stepping over behind this truck."  Yancy then closed the red, white and blue luggage.  Hunley moved the red,

white and blue luggage and the brown and gold luggage to the area behind the truck. Yancy carried the leather purse.

After they moved from the middle of the parking lot, Officer Irwin repeated his request for consent to search the luggage. Yancy responded, "yes." Hunley said, "go for it, you're just doing your job." Officer Irwin unzipped the brown and gold luggage, extended his hand under a blanket inside the luggage, and removed a sealed, knotted, opaque, dark-brown plastic bag. Officer Irwin testified that when he requested permission to untie the knot, Hunley again replied, "You are just doing your job, go ahead." Officer Irwin removed two rectangular-shaped objects completely wrapped in opaque, gray-colored tape that he believed to be packaging consistent with narcotics. Officer Irwin said that when he lifted the two wrapped, rectangular-shaped objects, Hunley sighed deeply and shook his head.

The officers then handcuffed Hunley and Yancy and took them to an office in the train station. Inside the office, Officer McLean "field tested" the substance in one of the rectangular-shaped objects. After the test indicated the substance was cocaine, the officers arrested Hunley and Yancy for possession of the cocaine. Yancy then said, "It's mine." Hunley said nothing. At no time did Hunley verbally or by conduct acknowledge possession or awareness of the concealed and carefully packaged cocaine.

After Yancy made her admission, the officers searched the red, white and blue luggage. In a child's shoebox, the officers found a third rectangular-shaped object of similar size and packaging to the two objects recovered from the brown and gold luggage. Later, when searching Hunley's person, the officers recovered a pair of train ticket stubs, a digital pager, and $33.70 in U.S. currency. The officers recovered from Yancy's person a cellular telephone and $44 in U.S. currency. In Yancy's leather purse, the officers recovered a "Signet Bank" bag containing $2,000 in currency and various small sheets of paper with names and dollar figures written beside them.

The evidence proved that Hunley had no illegal drugs on his person. As in Burton, mere proof that Hunley had a bag of clothing containing an illegal drug is insufficient to prove that he "'intentionally and consciously possessed [the enclosed opaque packages of drugs] with knowledge of its nature and character.'" 215 Va. at 713, 213 S.E.2d at 759 (citation omitted).

> [W]ell established principles apply to testing the sufficiency of circumstantial evidence. In LaPrade v. Commonwealth, 191 Va. 410, 418, 61 S.E.2d 313, 316 (1950), [the Supreme Court] summarized those principles as follows:
>
> ". . . [I]f the proof relied upon by the Commonwealth is wholly circumstantial, as it here is, then to establish guilt beyond a reasonable doubt all necessary circumstances proved must be consistent with guilt and inconsistent with innocence. They must

> overcome the presumption of innocence and exclude all reasonable conclusions inconsistent with that of guilt. To accomplish that, the chain of necessary circumstances must be unbroken and the evidence as a whole must satisfy the guarded judgment that both the corpus delicti and the criminal agency of the accused have been proved to the exclusion of any other rational hypothesis and to a moral certainty. . . ."
>
> But, circumstances of suspicion, no matter how grave or strong, are not proof of guilt sufficient to support a verdict of guilty. The actual commission of the crime by the accused must be shown by evidence beyond a reasonable doubt to sustain his conviction.

Clodfelter v. Commonwealth, 218 Va. 619, 623, 238 S.E.2d 820, 822 (1977).

Hunley made no statements and committed no acts that tend to prove he was aware of the presence or character of the items in the luggage. Recognizing the dearth of evidence, the Commonwealth asserts as a bald proposition that Hunley's "deep sigh" and "shaking of the head" as his head dropped are conduct which "suggests that [Hunley] was fully aware of the nature and character of the cocaine which the [officer] had found." The evidence undisputably proved, however, that the officers had earlier announced that they were looking for illegal drugs. Hunley's reaction, which was not seen by the trial judge but was described by the officer's testimony, clearly is consistent with a reaction of disbelief and dismay that he unknowingly was carrying opaque wrapped packages inside the luggage.

In Behrens v. Commonwealth, 3 Va. App. 131, 137, 348 S.E.2d 430, 434 (1986), the Commonwealth argued that awareness of cocaine may be inferred from an accused's "failure to show surprise." We rejected that simplistic analysis. See id. The Commonwealth now seeks to resurrect that argument by pointing to a reaction, even one that shows dismay, as indicative of "aware[ness] of the nature and character of the cocaine which the [officer] had found." The Commonwealth apparently believes any reaction will suffice to establish guilt. The notion that Hunley's sigh and drop of his shaking head proved that he intentionally and consciously possessed the cocaine in the opaque bag inside the luggage with knowledge of its nature and character is rank speculation. "The conviction of the accused depends upon a mere guess, or at least upon the arbitrary adoption of an interpretation of the evidence which incriminates the accused, when the evidence is equally consistent with his innocence." Henderson v. Commonwealth, 130 Va. 761, 767, 107 S.E. 700, 702 (1921). A conviction founded upon that analysis "cannot be sustained." Id.

In upholding this conviction, the majority disregards all inferences of innocence that flow from the evidence after viewing the evidence in the light most favorable to the Commonwealth. I disagree with that analysis. In our role on appellate review, we are required to defer to the fact finder's role in weighing the evidence. Thus, on appeal we must assume

that the fact finder found most persuasive the <u>evidence</u> that favored the conviction.  Once we defer to that role of the fact finder, by viewing the evidence in the light most favorable to the Commonwealth, we must then consider all the reasonable inferences that flow from that evidence.  See <u>Higginbotham v. Commonwealth</u>, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975).

An inference is a conclusion which may be drawn from the evidence by a process of logic and reason.  See <u>Ryan v. Maryland Casualty Co.</u>, 173 Va. 57, 61, 3 S.E.2d 416, 418 (1939); <u>Morton v. Commonwealth</u>, 13 Va. App. 6, 9-10, 408 S.E.2d 583, 584-85 (1991).  We do not limit our consideration just to those inferences that favor guilt and disregard the inferences that favor innocence.

> It is well settled in Virginia that to justify conviction of a crime, it is not sufficient to create a suspicion or probability of guilt, but <u>the evidence must establish the guilt of an accused beyond a reasonable doubt.  It must exclude every reasonable hypothesis except that of guilt.  The guilt of a party is not to be inferred because the facts are consistent with his guilt, but they must be inconsistent with his innocence</u>.

<u>Cameron v. Commonwealth</u>, 211 Va. 108, 110-11, 175 S.E.2d 275, 276 (1970) (citations omitted) (emphasis added).

We accept, as we must, the fact finder's role in determining credibility and accept the resolution of credibility issues in favor of sustaining the verdict; we then must determine what reasonable inferences flow from the accepted

evidence.  Whether an inference may be reasonably drawn from the accepted evidence is a matter of logic and reason; it is not a matter of determining whether to believe a witness' testimony.  When we view the evidence in the light most favorable to the Commonwealth, we accept the fact finder's determination of the believability of the witness.  In judging whether an inference reasonably flows from that evidence, no rule of law or logic requires that we find an inference to be unreasonable solely because it favors a defendant's theory of the case.

In our capacity as appellate judges, we do not abandon our obligation to scrutinize whether the evidence, so viewed, rationally supports the verdict of guilt beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 315-16 (1979); In re Winship, 397 U.S. 358, 364 (1970).  Thus, we must follow the long-standing rule in Virginia that "where the evidence leaves it indefinite which of several hypotheses is true, or establishes only some finite probability in favor of one hypothesis, such evidence cannot amount to proof [beyond a reasonable doubt], however great the probability may be." Massie v. Commonwealth, 140 Va. 557, 565, 125 S.E. 146, 148 (1924).  Those hypotheses may flow from inferences.  We are not at liberty to discard a hypothesis of innocence when it arises from an inference flowing from evidence viewed in the light most favorable to the Commonwealth.

If on appeal we accept only the inferences that favor the Commonwealth and discard all others (i.e., all reasonable inferences that favor the defendant after viewing the evidence in the light most favorable to the Commonwealth), we fail to perform our constitutional obligation to ensure that the evidence which supports a conviction rises to the standard of proof beyond a reasonable doubt. See Jackson, 443 U.S. at 318-19. We have clearly stated that "[w]here an inference supporting guilt is no more likely to arise from a proven fact than one favoring innocence, the inference of guilt is impermissible." Morton, 13 Va. App. at 11, 408 S.E.2d at 586. Indeed, it is well established that "where a fact which is equally susceptible of two interpretations, one of which is consistent with the interpretation of the accused, . . . the [fact finder may not] arbitrarily adopt that interpretation which incriminates [the accused]." Smith v. Commonwealth, 185 Va. 800, 820, 40 S.E.2d 273, 282 (1946).

I respectfully suggest that some of the confusion on this issue derives from statements found in cases decided by our Supreme Court. In Crisman v. Commonwealth, 197 Va. 17, 18, 87 S.E.2d 796, 797 (1955), and other cases, the Supreme Court stated the standard of review as follows: "When the sufficiency of the evidence is challenged after conviction it is our duty to view it in the light most favorable to the Commonwealth, granting all reasonable inferences fairly deducible therefrom."

See also e.g. Beavers v. Commonwealth, 245 Va. 268, 281-82, 427 S.E.2d 411, 414 (1993); Cameron, 211 Va. at 110, 175 S.E.2d at 276; Allison v. Commonwealth, 207 Va. 810, 811, 153 S.E.2d 201, 202 (1967).  In Higginbotham and other cases, the Supreme Court has used another variation of that standard, which states the same proposition as follows:  "Where the sufficiency of the evidence is challenged after conviction, it is our duty to consider it in the light most favorable to the Commonwealth and give it all reasonable inferences fairly deducible therefrom." 216 Va. at 352, 218 S.E.2d at 537.  See also Horton v. Commonwealth, 255 Va. 606, 608, 499 S.E.2d 258, 259 (1998); Boykins v. Commonwealth, 210 Va. 309, 311, 170 S.E.2d 771, 773 (1969).  However, the Supreme Court has also stated the following:  "[W]hen the sufficiency of the evidence is challenged on appeal, the evidence and all reasonable inferences fairly drawn therefrom must be viewed in the light most favorable to the Commonwealth."  Tuggle v. Commonwealth, 228 Va. 493, 510, 323 S.E.2d 539, 549 (1984), judgment vacated and remanded, 471 U.S. 1096 (1985); Hopkins v. Commonwealth, 230 Va. 280, 294, 337 S.E.2d 264, 273 (1985); Graham v. Commonwealth, 250 Va. 79, 81, 459 S.E.2d 97, 98 (1995).  In my view, a significant difference exists between this last statement and the first two statements.  The last statement of the standard is not the same semantic proposition as the first and second statements.

Viewing the evidence and the inferences in the light most favorable to the prevailing party, while discarding the inferences favoring the accused that flow from evidence viewed in the light most favorable to the Commonwealth, violates well established principles.  As the Supreme Court recently stated:

> "'It is our duty to regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.  When such evidence leads to the conclusion of guilt beyond a reasonable doubt, and excludes every reasonable hypothesis of innocence, [only then is it] sufficient to support a finding of guilt.'"

Tyler v. Commonwealth, 254 Va. 162, 165, 487 S.E.2d 221, 223 (1997) (citation omitted) (emphasis added).  Any other method leaves appellate courts with little choice but to affirm in toto all convictions based on circumstantial evidence.  We would "rubber stamp" convictions in violation of our mandate to ensure that no conviction stands unless guilt has been proved beyond a reasonable doubt.

No evidence in this record "establish[ed] 'possession' in a legal sense [because] it is not sufficient to simply show actual or constructive possession of the drug by the defendant." Burton, 215 Va. at 713, 213 S.E.2d at 759 (citation omitted). The majority avoids that conclusion by accepting an inference of guilt and discarding the inference of innocence that flows from Hunley's reaction to the officers' discovery of wrapped, taped opaque packages in the luggage he was carrying.  The inference

to be drawn from the proved evidence is a significant event in the chain of analysis because the evidence clearly proved that the luggage that Yancy unambiguously claimed to be her own (the red, white and blue luggage) was later found to contain a package of cocaine wrapped identically to those contained in the brown luggage. Indeed, the evidence also proved that Yancy acknowledged that the cocaine in the brown and gold luggage was hers.

I would reverse Hunley's conviction because the proof was insufficient to establish beyond a reasonable doubt that he intentionally and consciously possessed the wrapped opaque packages in the luggage with knowledge of its nature and character. I dissent.